King, J.
This is a proceeding to reverse the judgment of the court of common pleas in a case of the same title, brought in that court. The action was brought by the plaintiff to recover the possession of certain real property from the city-, which he-claims it had taken possession of. The property described ás the property of the plaintiff, was leased to the plaintiff’s graritor by the state of Ohio, and the controversy arises over the boundary line. The-description set forth in the petition is this:
“Beginning at a point 2 feet at right angles from the mrth face of the chamber of Lock No. 2, Toledo side cut, and opposite the foot of said lock; thence north 6-|-degrees east to the bank of Swan creek; thence westwardly up Swan *573 creek to a point from whence a line drawn south 6$ degrees west to its intersection with a line drawn from the point of beginning north 88$ degrees, west will include 4-100 of an acre. ”
74-100 is said to be a mistake, and that 75-100 would be correct.
The defendant answers the petition and avers that it is in the possession of certain property under a certain lease to it, being the property that was leased by the state to another party previously, and it alleges in its amended answer that the property leased is a piece of property lying next west of and adjoining the property which the plaintiff claims to own. So that, as I say, the only question is as to the boundary line between the property which the plaintiff claims to hold under a lease from the state, and that of the city, holding its property under a similar lease from the state.
This property which the plaintiff claims to own was first leased to James Myers, in 1859. That lease, in 1868, was transferred to Augustine Pilliod. The transfer of that lease was then recorded. I should say that that lease was for a period of thirteen years, and, in 1872, the lease was renewed to said Pilliod for a period of thirty years. Pilliod went into possession in 1869, and soon after built a mill upon the premises which he had taken under his lease, and continued to occupy the premises from that time up until about 1880. Sometime in 1864, the state leased to a man by the name of Lind, the property next west described in the answer, and described as being next west of the property leased to Pilliod; and in 1879 this property was again leased to the city of Toledo, and it is described as being situated next west of the property leased to Pilliod. The description in Pilliod’s lease is as follows:
“All that certain piece or parcel of land situate between lock No. 2, Toledo side cut, and the acqueduct crossing Swan creek, but bounded and described as follows: Beginning at a point 72 feet at right angles from the north face of the chamber of lock 2, Toledo side cut, and opposite the foot of said lock; thence north 6$ degrees, east to the foot of the bank of Swan creek; thence westwardly up Swan creek to a point from which a line drawn south 6$ degrees, west to its intersection with a line drawn from the point of beginning north 83$ degrees, west, which included 75-100 of an acre.”
That property was acquired by the state of Ohio, the property included in the lease to Pilliod, by a deed from C. T. Williams, September 17, 1842; and in 1851 it was surveyed *574 in connection with other property, by Thomas Clark, then a surveyor and civil engineer living in the city of Toledo, and he surveyed and described the property as follows:
“A lot at lock No. 2, beginning at a point 72 feet at right angles from the north face of the lock at its foot; thence north 6J degrees, east to Swan creek; thence up Swan creek far enough to contain 75-100 acres by running south degrees west, to intersection with a line running north 88£ degrees west from the place of beginning.
Now, that description made.by the survey of Thomas Clark first in 1851 is the same description incorporated in the lease .to Pilliod, save and except that the first line in the lease to Pilliod is described as running to the foot of the bank of Swan creek; whereas in the survey it is described as running to the creek. Besides that, the descriptions are alike. In 1852, another survey was made to find out the quantity of land next west, and described as situate next west, and that survey refers to the lines run in this survey. Now, then, we think from the testimony in the case, that the description of this land put into the lease to Pilliod was intended to be the description of the land as surveyed by Clark, and was the first piece of property that the state acquired at that point. At the time that the city came into possession of this lease, in 1879, they erected a fence on the supposed boundary, and the arrangement seems to have been this: The superintendent of the work-house went out there and wanted to have a line, as it was necessary to put a fence around their property, and he went to Mr. Pilliod, who was then in possession of his piece, and Mr. Pilliod says he pointed out to him where the stake was which had been set before he came there — by whom he does not testify — but he supposed to indicate the southwest corner of his property, and that that was the line, and a line drawn from there to the creek would furnish the west line of his property, and the east line of the city’s property. He testifies that he saw that stake there in 1868, and he lost sight of the stake, and he don’t think it was seen after that time. In 1879 he pointed out the place where he then understood and supposed the stake had stood; but he is not very clear in his testimony whether that was the place, or not, since no mark or monument existed by which he could locate the stake. That was all the testimony offered on the part of the defense as to where the stake stood when the city located its fence, and -that stake seems to be the monument which was necessary to determine the line between these two adjoining properties. We have looked this testimony over very'carefully,and come *575 to the conclusion that the position of the stake could have been ascertained when the city went there to occupy, and that it was very readily ascertainable at the commencement of this suit.. One witness, Mr. Marston,a surveyor, testified that he went out there and followed up the survey of Mr. Clark; that he had in his possession Mr. Clark’s field notes; he also had this plat which Mr. Clark had made, and which was filed and became a part of the records of this county. And he also had the description in this lease, and he followed the lines as indicated in these surveys of Clark, and at the point where he would suppose the corner to be he dug down and found a stake which he swears was a surveyor’s stake. Nobody has contradicted or disputed him on this point. There is some other evidence indicating that a stake stood at or about the place where Mr. Marston said he found this one.
The question is raised here that a survey made at the time of the commencement of this suit, or while it was pending, run substantially on the east line as indicated by the original survey, and to the water of Swan creek, and then back up Swan creek far enough to reach this fence, which would include within its boundary more than 75-100 of an acre. But there is also testimony tending to show that Swan creek has been filled up by piling for docks, and probably by earth and rubbish, that it had accumulated within twenty-five or thirty years, since that was first occupied, and whether the line is where it was in 1851, we are left largely to conjecture, though there is some evidence that it has been filled up some sixteen or seventeen feet. No matter how that is, it is pretty clear that the description in this lease follows Clark’s survey, and unless the parties have done something themselves to establish a different line, or are in some way estopped to dispute that line, then that survey should govern. There is no question of adverse possession ifi this case, since the city has only been in possession of this property since 1879, and it seems pretty clear to us that when that place was pointed out by Mr. Pilliod, it was to indicate where the actual line was; but no attempt was made to find the actual line, and we think that the actual line could have been readily found at that time if a surveyor had been employed and had gone there to find it, so that the line as pointed out by Mr. Pilliod and as acted upon by the city became a line established by mistake rather than by any agreement of the *576 parties, and that having only existed since 1879, we do not think that the plaintiff, or those who preceded him are estopped from now .claiming the true line, and that line, we think the testimony all shows to have been at that stake, and that stake was fourteen or fifteen feet west of the fence; the surveyors have given the exact distance, and for that reason the verdict of the jury is not sustained by the evidence in this case.
I should say that on the trial of the case the plaintiff offered in evidence, by the witness Marston, who had in his possession the books and papers belonging to Mr. Clark, the field notes taken by Clark when he made his first survey,and from which field notes Clark had prepared the several maps which were introduced in this case. Those field notes were made in 1851, and Mr. Clark is dead. We think the court should have admitted those field notes, provided they contained anything that bore upon the controversy; and it is claimed by the plaintiff that they did. I have not examined them to know whether they did or not. They contained data made by the surveyor in the line of his duty as a surveyor, and the notes indicating exactly what the survey showed, it seems to us, would have been competent evidence.
I think that this is the only exception, except one in the charge, which is not urged by the plaintiff below, and, in reading over the charge, we do not find that there was any error made in it. The court very plainly set forth the principles of law upon which the plaintiff was entitled to recover, but the jury, as it seems to us, disregarded the evidence by finding for the defendant, and for that reason the judgment of the court of common pleas will be reversed, and the case remanded to the court of common pleas for a new trial